## COURT OF APPEALS.

### March 22, 1910.

## THE PEOPLE v. GILBERT COLEMAN.

(198 N. Y. 166.)

(1). MURDER—SUFFICIENCY OF EVIDENCE.

On examination of the evidence on the trial and conviction of defendant for homicide in causing the death of his wife, *held*, that the facts and circumstances warrant the conclusion that the defendant slew his wife with the deliberate and premeditated intention to cause her death, and that his conviction of the crime of murder in the first degree is fully justified by the record made against him.

(2). SAME—DEFENSE OF INSANITY—NEW TRIAL.

Affidavits were presented on an application for a new trial for the purpose of showing that counsel for defendant had been given no opportunity for preparation for trial and that an application for a continuance, made after the trial had been commenced, to enable him to produce witnesses to testify to defendant's mental irresponsibility, was improperly denied. *Held*, that the record does not bear out the statements of defendant's counsel; that the affidavits presented fall far short of establishing that defendant was mentally irresponsible, and that there is an absence of evidence tending to show with reasonable certainty that the defendant, at the time he killed his wife, labored under any defect of reason which rendered him incapable of knowing the nature and quality of his act or of knowing that it was wrong.

APPEAL from a judgment of the Supreme Court, rendered February 15, 1909, at a Trial Term for the county of New York, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Judson Douglass Wetmore,* for appellant. Under all the circumstances of the case, a new trial should be ordered, for the reason that defendant did not have a fair trial. (*People v.*

*Callabur,* 91 App. Div. 529; *People v. Carbone,* 156 N. Y. 413).

*Charles S. Whitman, District Attorney (Robert C. Taylor* of counsel), for respondent. The verdict of murder in the first degree was not only justified, but was necessitated by the evidence. (*People v. Schmidt,* 168 N. Y. 568; *People v. Zachello,* 168 N. Y. 35; *People v. Sliney,* 137 N. Y. 570; *People v. Sanducci,* 195 N. Y. 361; *People v. Carlin,* 194 N. Y. 448; *People v. Fish,* 125 N. Y. 136; *People v. Krist,* 168 N. Y. 19; *People v. Pekarz,* 185 N. Y. 470; *People v. Minnaugh,* 131 N. Y. 563; *People v. Tice,* 131 N. Y. 651). There was no error in refusing to grant the adjournment. (*People v. Jackson,* 111 N. Y. 362; *People v. Browne,* 118 App. Div. 793; 189 N. Y. 528). The motion for a new trial was properly denied. (*People v. Gambacorta,* 197 N. Y. 181; *People v. Buchanan,* 145 N. Y. 1; *People v. Priori,* 164 N. Y. 459; *People v. Koepping,* 178 N. Y. 247; *People v. Patrick,* 181 N. Y. 131).

WERNER, J.:

There is little to say of the history of the homicide for which the defendant was indicted, tried and convicted, except that it is the oft-repeated and too familiar story of drunkenness, jealousy and murder. On the 29th day of December, 1908, the defendant killed his wife in their apartment at No. 36 West 136th street in the Borough of Manhattan, in the city of New York. The defendant was twenty-five years of age, his wife was two years younger, and they had been married but little more than a year. He was a cook in the railroad dining car service, and she worked for various housekeepers and in laundries as she had opportunity. Their married life had not been happy. His duties necessitated much absence from home and

she sought companionship among the men and women of her class, composed largely of single persons who frequented so-called negro social clubs and dance halls. The defendant was jealous of his wife, frequently remonstrated with her for associating too freely with other men, and greatly aggravated his real and fancied grievances by over-indulgence in drink, thus accentuating a hereditary predisposition to indigestion and consequent irritability and depression. At the time of the homicide this unfortunate pair shared their apartment with a woman named Womac, who testified that the defendant and his wife had frequently quarreled, that he had several times threatened to kill her, and that he had made such a threat on the preceding Sunday. On Monday morning, the day before the homicide, the couple had an altercation. The defendant left the apartment for the ostensible purpose of drawing his pay from the railroad company by which he was employed, returned between four and five o'clock in the afternoon, asked the Womac woman where the girls were, referring to his wife and his sister, and receiving an unsatisfactory reply he slapped the woman in the face. He had been drinking heavily during that day and when he went to bed he was in a state of nervousness bordering on frenzy. Passing to the fateful Tuesday, it appears from defendant's own statement that he drank half a pint of liquor before he left the house in the morning; his wife went out to work, and he started for Jersey City to get his pay. He took four or five drinks before reaching Jersey City, and a number, how many he does not remember, after he left there and before he returned to the apartment. On his way back he stopped in 9th avenue at a pawnbroker's and bought a revolver, for the purpose, as he says, of blowing out his brains. Then he proceeded to a saloon where he took a number of drinks. He next appeared in the apartment house where his brother lived in 118th street. Between twelve and one o'clock noon, he was

found, by Mrs. Goode and Mrs. Larkin, upon the stairs in a drunken stupor. Recognizing him, these women notified his brother who came and attempted to pull the defendant up stairs. This aroused the latter, who drew his revolver and threatened to shoot his brother. In the melee the weapon became caught in the lining of defendant's coat, some of the shells dropped out, and it was finally taken away from him. The defendant was in a very ugly framme of mind, but was finally pacified and taken to his brother's apartment, where he asked that his wife be sent for. Meanwhile his brother John questioned him about the revolver and he replied that he had bought it to shoot Carrie, his wife. The latter, having arrived at the brother's apartment, went in to her husband, who said to her that he had been waiting on the stairs to kill John and his wife and added, " I am going to blow your brains out too."

According to the testimony of those who witnessed this scene, the defendant had then become sufficiently sobered to go home with his wife. His own story is that on the way they stopped to get some butter; that his wife called him a vile name and told him he was crazy; that she asked him to walk behind her as she did not wish people to see her with a " hard looking laboring man like him; " that they met a young man who accosted her. and when the defendant remonstrated with her for not introducing him to the young man, she replied, " Oh hell, he is a sport, and does not want to meet a hard looking laboring man like you." The couple arrived at their apartment between five and six o'clock in the afternoon, where they found the Womac woman and three young men named Mason, Clark and Chisholm. The defendant and his wife at once proceeded to their bedroom from whence the Womac woman heard sounds of quarreling. Mason and Clark testified that they heard the wife exclaim " stop " and " murder." At this juncture the Womac woman left the apartment, the defendant came into

the room where the three men were seated, asked them to play cards, but they declined, and in a few minutes departed.

This outline of preliminary facts brings us now to the threshhold of the homicide. The defendant and his wife were alone in the apartment. About half an hour after Mason, Clark and Chisholm had gone out, the Womac woman returned. The first thing to attract her attention was the odor of gas. She called and received no reply. From the direction of the Coleman bedroom she heard " a choking like trying to get breath." She went into the hall and found a man named Lemond, who looked in, saw what had happened, and at once called a policeman. The latter entered and found the deceased lying on the bed with a knife protruding from the right side of her neck and a " smoothing " iron lying on the bed. A message for an ambulance brought an immediate response. Dr. Bennett, who was in charge of it, discovered faint signs of life, and removed the knife from the woman, but as the victim died before he could arrange to take her to the hospital, he withdrew and left the case to the coroner. That official arrived soon after, found life extinct, and later made an autopsy. This disclosed that the victim's head had been crushed on the right side over the ear; the fractured area being about the size of an open hand and so marked that the brain protruded. There were two separate and disconnected stab wounds on the neck; one on the right side and the other below the lobe of the left ear; also four lesser stab wounds on the back of the right hand and five on the back of the left hand. The fracture of the skull was probably the result of several distinct blows, and the stab wounds in the neck could not have been made by one incision. That the deceased had been brutally murdered was, of course, the only rational conclusion to be drawn from the circumstances. The record does not disclose whether the stab wounds in the neck were sufficient to have caused death, or whether they were inflicted

before or after the skull was crushed. That is a matter of no importance, however, since it was conclusively established that the fracture of the skull was of such a character as to have caused death even if there had been no other wounds.

When the body of the deceased was found in the condition described the defendant was missing. He was the last person seen with her while she was alive, and he was gone when her dead body was found. His own story reveals his subsequent movements. He left the apartment, got half a pint of whisky, went to the house of a friend on 37th street, remained there all night, got more whisky in the morning, shaved off his mustache and borrowed a pair of glasses from his friend for the purpose of disguising himself. Later in the day he went to Jersey City, where he took a train which brought him to Port Jervis at about three o'clock in the morning of January 1st, 1909. About an hour later, while wandering about the vicinity of Port Jervis, he was arrested and brought to police headquarters in New York city, where he made a full confession of his guilt. In all its essential details this confession corroborated the circumstances proved by the prosecution at the trial, and all this was later supplemented by his testimony as a witness in his own behalf. There are still other corroborative facts and circumstances to which we have not alluded, but enough has been written to warrant the conclusion that the defendant slew his wife with the deliberate and premeditated intention to cause her death, and that his conviction of the crime of murder in the first degree is fully justified by the record made against him.

All this is practically conceded by his counsel upon this appeal, who asks us to reverse the juudgment of conviction, not upon the record as it stands, but as he says he would have made it if the trial court had given him the opportunity. Because of this unique position we have dwelt upon the circumstances of the case at greater length than would otherwise have been

deemed necessary, and we shall now briefly consider the case as presented by defendant's motion for a new trial. Upon that motion his counsel asserted, as he now asserts, that he was called upon to assume the defense of the accused during the progress of the trial; that he had been given no opportunity to prepare; that he so informed the trial court; that he asked for an opportunity to produce testimony which would tend to prove that he defendant was mentally irresponsible for his acts when he killed his wife; that he was denied the right to produce his witnesses, and that the defendant did not have a fair trial. If all this were true, it would appeal most urgently to our sense of justice and to the discretionary power of review vested in us by the statute. But it is not true. The record does not bear out the statements of counsel for the defendant, and the affidavits presented by him on the motion for a new trial fall far short of establishing the defendant's mental irresponsibility.

In order to get the true bearing of the argument now made by counsel for the defendant, it is necessary to consider briefly the circumstances in which he came into the case. When the defendant was arraigned for his plea to the charge in the indictment, he stated that he was without means to retain counsel. The court thereupon assigned Messrs. Whitman and Wheaton to defend him. The trial was commenced on the afternoon of February 9th, 1909, and at the hour of adjournment twenty-six talesmen had been examined, ten of whom were found acceptable as jurors. During this period the present counsel for defendant was in court and apparently consulting, from time to time, with the assigned counsel. On the following morning, when the trial was resumed, a talesman was called to the box and asked a single question. At this juncture Mr. Whitman, one of the assigned counsel, suggested to the court that, for reasons which he had explained, he ought to retire from the case. Mr. Wheaton, the other assigned counsel, joined in this sugges-

tion. The court granted the request, and thereupon the district attorney proceeded with his examination of the talesman. Mr. Wetmore, the present counsel for defendant, was in court, took part in that examination and stated that the talesman was acceptable to the defendant. After this talesman had been sworn as a juror, Mr. Wetmore arose and made a motion for the continuance of the case, stating that he had represented the defendant at the coroner's inquest and had consulted with him ever since; that the assigned counsel had understood that he (Wetmore) was to be employed by the defendant's family, and that the case had been set down for trial without notifying him. When asked by the court what the ground of his application was, Mr. Wetmore replied that he was not ready; that he had been given no time for preparation. The court denied the application, stating that Mr. Wetmore had never appeared as attorney until that day, and had made no application, although he knew that counsel had been assigned for the defendant and had been consulting with them in court. The record does not disclose the true situation, but the affidavits presented upon the motion for a new trial very clearly indicate what it was. Mr. Wetmore had been negotiating with the defendant's sister for a retainer fee, and this had not been satisfactorily arranged for until the trial had actually commenced. It is obvious that he was not willing, at least not anxious, to appear in the case until his compensation had been definitely provided for. When that was finally arranged he had an interview with the assigned counsel, and as a result of it the latter withdrew from the case. Instead of making his motion at the opening of the trial Mr. Wetmore sat by and permitted the trial to proceed until he was assured of his stipend. Then for the first time did he announce to the court that he was not ready for trial. As this is a case involving the issue of life and death we shall not stop to characterize counsel's conduct,

but shall proceed to ascertain whether the application was made in apparent good faith and whether the denial thereof by the court was prejudicial to the defendant.

When the motion for a continuance had been denied the trial was resumed. If there was an lack of preparation on the part of defendant's counsel the record contains no hint of it. His cross-examinations of the various witnesses for the People evinced great familiarity with the case and the whole conduct of the trial negatives the counsel's claim of unreadiness. Counsel now asserts that if he had been given time he could have produced a number of witnesses who would have testified to defendant's mental irresponsibility. That does not coincide with his outspoken attitude upon the trial. At the close of the People's case the defendant's counsel made a short opening address. He told the jury that his client had killed his wife and that his only defense could be that when he did it he was not in a condition to premeditate the act. Continuing he added: "We will not introduce any experts to testify as to his condition of mind—experts on insanity or sanity. *We have made no attempt or preparation to do such a thing, because we felt that twelve intelligent citizens were as good judges, and in a great many instances a good deal better judges than the average paid expert.* . . . We have resorted and will resort to no subterfuge. We will tell the plain story to the jury and leave it entirely to your good judgment as to whether, under the circumstances, . . . this man was in such condition that he was irresponsible for what he did." That address was made at a stage of the trial when it is inconceivable that any trial judge, much less one who is prudent, fair and painstaking, would have jeopardized the defendant's life by denying an honest application for a reasonable delay to enable him to perfect his defense. The fact that counsel's motion was not renewed and the character of his opening address to the jury, plainly

indicate that the motion for a new trial upon the grounds stated, was purely the result of afterthought.

Turning to the affidavits submitted in support of the motion for a new trial, made nearly a month after judgment had been pronounced upon the defendant, we find a most conclusive answer to the argument of his counsel upon this appeal. If we assume the truth of everything contained in these affidavits, it affords no basis for interference with the judgment herein. The hypothetical question in the affidavit of Dr. Weinberg, upon which the affiant predicates his assumption of defendant's insanity, is one which would not long withstand the test of intelligent cross-examination; and the doctor's bold and unqualified assertion that the defendant was insane does not rise to the dignity of evidence indicating that the defendant's mind was so affected that he did not know the nature or quality of the act he committed or did not know that it was wrong. The defendant's sister, who was present at the trial but not called as a witness, makes an affidavit giving a history of defendant's physical and mental peculiarities, attributing to him defects and deficiencies which are not rare in the human race and are not generally regarded as evidence of insanity. This is equally true of the other affidavits bearing upon the same subject. Similar considerations apply to the affidavits setting forth defendant's family history. These affidavits, briefly summarized, indicate that the defendant had been a backward, sickly child, somewhat weak-minded and morose, given to occasional periods of religious exaltation, suffering much from indigestion and headaches, and predisposed to pulmonary troubles; that his father is a dyspeptic; that there was tuberculosis in his mother's family; that his sister died of that disease; that his great grandmother was insane; that a paternal aunt had violent hallucinations, and that an uncle was a religious fanatic. All these things my be true without connecting the defendant with

any taint of insanity or defect of reason that renders him legally irresponsible for his acts. Few human beings are physically or mentally perfect. A large percentage of the human race are the victims rather than the beneficiaries of their heredity. · If there were no physical and mental defectives there would probably be no crime. Such a family history as is ascribed to the defendant is not uncommon in criminal annals. There is an utter absence of evidence tending to show with reasonable certainty that the defendant, at the time he killed his wife, labored under any defect of reason which rendered him incapable of knowing the nature and quality of his act or of knowing that it was wrong. Measured by that legal test, the evidence submitted upon the motion for a new trial was insufficient and the application was properly denied. No other alleged errors have been brought to our attention. We have carefully read the record and are convinced that the defendant had a fair trial and that his conviction was fully warranted by the evidence.

The judgment of conviction should be affirmed.

CULLEN, Ch. J., GRAY, EDWARD T. BARTLETT, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur.

Judgment of conviction affirmed.